UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DEBORAH BRINGLEY,

                         Plaintiff,                    No. 07-CV-6618 CJS

   -vs-

                                       DECISION AND ORDER

JOHN E. POTTER,
Postmaster General,

                         Defendants.

_____

APPEARANCES

For Plaintiff:               Christina A. Agola, Esq.
                               Steven Laprade, Esq.
                                 1415 Monroe Avenue
                               Brighton, New York 14618

For Defendants:           Kathryn L. Smith
                                 Assistant United States Attorney
                                 100 State Street, Suite 620
                                 Rochester, New York 14614

INTRODUCTION

This is an action alleging employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*.  Now before the Court is Defendant's motion for summary judgment. (Docket No. [#15]).   For the reasons that follow, Defendant's application is granted and this action is dismissed.

BACKGROUND

Unless otherwise noted, the following are the facts of this case viewed in the light most favorable to Plaintiff.

1

Prior to January 2007, Plaintiff had been employed by the U.S. Postal Service ("USPS") for approximately thirty years. For the last six of those years, Plaintiff was employed as an Electronics Technician ("ET") in the USPS Maintenance Department in Rochester, New York. Such position was a "craft" union position, as opposed to a management position. However, the USPS provided opportunities for craft employees to gain managerial experience by taking "detail assignments" to management positions.

A craft employee, though, could lose his or her regular craft "bid" position by remaining on such a detail assignment too long. In that regard, the collective bargaining agreement ("CBA") between the USPS and the American Postal Worker's Union ("the Union") contained a provision concerning such detail assignments which stated, in pertinent part:

> The duty assignment of a full-time maintenance employee detailed to a non-bargaining unit position, including a non bargaining unit training program, in excess of four (4) months shall be declared vacant and shall be posted and filled in accordance with the provisions of this Article. Upon return to the Maintenance Craft, the employee will become an unassigned regular. An employee detailed to a non-bargaining unit position will not be returned to the craft solely to circumvent the intent of this provision.

Def. Ex. 3, CBA Article 38.7.E. Despite the last sentence of this provision, Plaintiff maintains that as a practical matter, a craft employee could essentially remain on a particular detail indefinitely, as long as he did not stay in such detail for longer than four consecutive months, and then returned to his craft position for at least two weeks before resuming the detail assignment:

> A. I was a union steward and I know what the contract says, it's 120 consecutive days, it clearly states – and we even had that in our . . . Maintenance National Article 38, we actually specified a pay period, which is

2

two weeks; we can go back for two weeks and then go back to a detail.[1]

Q. And wasn't there some language in [the CBA] about not doing that if the intent was to circumvent the requirement.

A. Yes, that is in there, but you can never *prove* the circumvent stature. [sic]

Plaintiff's Deposition ("Pl. Dep.") at 29-30 (emphasis added).  Moreover, it appears that in general practice, craft employees who completed a four-month detail were often permitted to work for at least two weeks in their permanent position before returning to the same detail assignment, to avoid losing their permanent craft "bid." Def. Stmt. of Facts ¶ 7.  However, as discussed further below, Defendant maintains that this occurred in situations in which the craft worker's union did not seek to enforce Art. 38.7.E.  In other words, Defendant maintains, the union did not push the issue unless another union member wanted the bid of the employee assigned to the detail.

Employees were assigned to work in one of three shifts or tours, as follows: Tour I: 11 PM to 7:30 AM; Tour II: 7 AM to 3:30 PM; and Tour III: 3 PM to 11:30 PM.  Plaintiff preferred to Work Tour III, even though she acknowledges that Tour II was the most desirable shift for most people. Pl. Dep. at 47.  On the other hand, Plaintiff considered Tour I, "the Graveyard Shift," to be the least desirable shift, and she maintains that supervisors would threaten to assign employees to Tour I as a punishment :

A. [Assignment to] Tour I has been threatened to us for years.

---

[1]For support of this contention Plaintiff apparently relies on a version of Article 38.7.E which pre-dated or post-dated the CBA that was in effect in January 2007.  In that regard, attached to the EEO complaint that she filed in June 2007 is a photocopy of a provision that states, in pertinent part: "An employee detailed to a non-bargaining unit position must return to the craft for a minimum of one continuous pay period to prevent circumvention of the intent of this provision." See, Def. Ex. 1, p. 11.  However, Plaintiff agrees that the CBA that was in effect in January 2007 states that a maintenance employee "detailed to a non-bargaining unit position will not be returned to the craft solely to circumvent the intent of this provision." See, Pl. Response to Def. Rule 56.1 Stmt, ¶ 31.

3

Q. That's how you get punished?

A. Yes.

Q. Go to Tour I, the graveyard shift?

A. Correct.

Pl. Dep. at 46.

Between 2005 and January 2007, Plaintiff had been detailed to four non-bargaining unit positions:   Maintenance Supervisor Tour III, Maintenance 010[2] Supervisor Tour III, Maintenance Supervisor Tour II, and Mail Processing Tour III.[3]  Significantly, none of the assignments was to Tour I.  On each of these details, Plaintiff's pay grade was Level 17, while her usual craft pay grade was Level 11.  Consequently, these detail assignments permitted Plaintiff to earn more money.  All of these detail assignments were approved by Vincent Catapano ("Catapano"), the Maintenance Manager at the Rochester USPS facility. *See*, Def. Stmt. of Facts ¶ ¶  12-13.

In or about July 2006, there was a permanent job opening for Maintenance Supervisor, Tour III. Pl. Dep. at 37.  Plaintiff applied for the position, as did Kevin Dyson ("Dyson").  Catapano selected Dyson for the position, even though Plaintiff maintains that she was the better candidate.[4] [5]  In that regard, Plaintiff states that Dyson was less

---

[2]Maintenance 010 Supervisor was a special position that was required specifically at Christmas to handle the large volume of Christmas mail. Pl. Dep. at 14.

[3]Each of these details lasted the maximum 120 days permitted for such assignments. See, Pl. Affidavit ¶ 31.

[4]Plaintiff did not file an EEOC complaint concerning this incident.

[5]Plaintiff indicates that after Catapano promoted Dyson to Maintenance Manager of Tour III, he transferred him to Tour II, which meant that there was still an opening on Tour III. Pl. Dep. at 43-44. Plaintiff indicates that Catapano knew when he made the promotion that Dyson could not work nights, because he had "custody problems" with his children. Def. Ex. 1 at p. 7.  In that regard, Plaintiff reasons

4

qualified and less experienced than she was, and that he had "problems with the

paperwork" and  "attendance problems." See, Def. Ex. 1 at p. 6; Pl. Dep. at 37-44; Pl. Aff.

at ¶ ¶ 20-22.

Subsequently, Catapano approved Plaintiff for temporary detail assignments.  In

January 2007, Plaintiff completed a four month detail assignment in Mail Processing, and

returned to her regular ET position in the Maintenance Department.  Plaintiff intended to

remain in her ET craft position for only two weeks, and then seek to be reassigned to

another detail in Mail Processing, which was the detail in which she had just worked for

four months.  Accordingly, upon returning to her craft ET position, Plaintiff went to

Catapano and asked if she could return to the detail in Mail Processing.  Plaintiff indicates

that over the next two weeks, Catapano did not give her an answer, and that eventually

she reported for work in Mail Processing without his express permission, since she

interpreted his silence as "implied consent. Pl. Dep. at 22.  Catapano, though, became

angry and directed her back to work in her ET position. *See*, Pl. Dep. at 22-26.  At that

point, Catapano denied Plaintiff's request to go to Mail Processing, and told her that he

needed her to remain in her craft position because he was short-staffed for ETs. *Id*. at 26-

27.[6]  Plaintiff continued to ask Catapano about the detail, and a few days later Catapano

---

that, "Mr. Catapano was aware of this before [Dyson's] promotion, because Mr. Dyson had to take time off
from work to make court appearances." *Id*.  On this point, Plaintiff seemingly suggests that Catapano's
promotion of Dyson was doubly discriminatory, because he knew that Dyson was not able to work the
position to which he was being promoted.  However, Plaintiff does not explain how Dyson's taking time off
from work to attend court proceedings would have alerted Catapano to the fact that Dyson could not work
Tour III.

[6]Plaintiff indicates that Catapano was being untruthful when he indicated that he was short-staffed
for ETs, because a month later, Catapano permitted another ET, Dennis Berryman ("Berryman"), to go on
a detail. Pl. Dep. at 26-27.  However, Defendant explains that Berryman was permitted to leave his ET
position for four weeks, because he had recently trained to operate new "CIOS machines" which the
USPS was installing, and he "was detailed to oversee site preparation for the installation of the new

told her that she could return to the Mail Processing detail, but if she did, he would post her bid, meaning that she could lose her usual position as an ET in the Maintenance Department. See, Pl. Ex. Vol. II, Ex. J at 3.  Specifically, Catapano indicated that if Plaintiff returned to Mail Processing, he would have to post her ET job for bid pursuant to CBA Article 38.7.E., since the Union would force him to post the position. Pl. Dep. at 29-31.  Plaintiff denies that the Union was pressuring Catapano in that manner, and she maintains that she spoke with a union shop steward, Doug Sheehan ("Sheehan"), who denied that the union had said anything to Catapano concerning her ET position.[7] (However, Plaintiff has not provided any evidentiary proof in admissible form on this point, such as an affidavit from Sheehan or anyone else associated with the union.)

However, Plaintiff maintains that Catapano was incorrect in stating that the CBA required him to post her bid if she returned to the Mail Processing detail. *See*, Def. Ex. 1 at p. 5 ("Mr. Catapano claimed that it was by the National Agreement.").  When asked in June 2007 to explain why she believed that Catapano was being dishonest on this issue, Plaintiff stated: "The old contract was vague on the topic.  *The new contract, which took affect [sic] Feb 3, 2007, clarified the matter*.  Mr. Catapano has never changed his position to match the new contract." *Id*. (emphasis added).  However, Plaintiff maintains

---

equipment." Catapano Aff. ¶ 13-14, Def. Exhibit 4.  Catapano indicates that he was short-staffed for ETs, but denies that this caused him to deny Plaintiff's request to return to Mail Processing.  Instead, he indicates that he told her that she could return to Mail Processing, but that he would have to repost her bid position in accordance with the CBA.. Def. Ex. 4 at p. 3.

[7]Pl. Dep. at 30.  Plaintiff indicates that Sheehan was the Shop Steward for the Maintenance Department. *Id*.  Sheehan purportedly told Plaintiff that he personally had not said anything to Catapano about Plaintiff's position, and from this Plaintiff believes that Catapano's purported concern about the CBA was pretextual.  Sheehan's alleged statement is hearsay to the extent that Plaintiff seeks to use it to prove that Catapano was not being pressured by the Union.

that Catapano told her about having to post her bid on January 25, 2007, which would have been before she maintains that the new contract became effective. *Id.* Furthermore, the 2003 CBA, which Plaintiff indicates was in effect in January 2007, contains the following statement: "An employee detailed to a non-bargaining unit position will not be returned to the craft solely to circumvent the intent of this provision." Def. Ex. 3 at p. 3.  In an affidavit, Catapano states that he was required to follow the 2003 CBA, because the new agreement had not taken effect: "[I followed] Article 38 of the National Agreement which was in effect at that time.  The new, 2007, National Agreement had not yet become effective.  Article 38 states that employees cannot be returned to their bid position from a higher level detail in order to circumvent the requirements for reposting of the employee's position." Def. Ex. 4 at p. 2.[8]  Catapano further states: "Under the old contract the union and I had agreed not to repost Ms. Bringley's  position as long as she returned to her ET position for 2 weeks between details *and did not return to the same position on detail*.  . . .  In this case, she would have been returning to the same Mail Processing position." Def. Ex. 4 at p. 6 (emphasis added).

Plaintiff alleges that by threatening to post her bid, Catapano prevented her from returning to Mail Processing, and treated her less favorably than three other Maintenance Employees who were permitted to remain on details without having their bids posted: Two males, Donald Zimmerman ("Zimmerman") and Donald Recino ("Recino"), and a female,

---

[8]In discussing this provision, Catapano indicates that he would have been required to repost Plaintiff's bid position if she returned to the Mail Processing detail, since she had just completed a four-month stint at that position, but not if she took the Tour 1 assignment as Maintenance Supervisor, since she had not previously worked that detail. See, Def. Ex. 4 at p. 2 ("I offered Complainant two options:  she cold  become a 204-B Acting Supervisor in Maintenance on Tour 1, or she could return to a detail to 204-B Acting Supervisor in Mail Processing.  However, I told her that if she returned to a Mail Processing Detail I would have to post her position in accordance with the union contract.")

Rebecca Neven ("Neven"). Def. Exhibits, Ex. 1 at p. 4.  Plaintiff, though, does not

specifically indicate that Catapano was involved in those assignments, or when they

occurred, and Catapano denies that he detailed Zimmerman or Recino.  Def. Ex. 4 at p.

4.  As for Nevin, Catapano indicates that she was given a repeat detail assignment, but

that unlike Plaintiff, Nevin's bid position was as a custodian, and that the Union was not

requiring him to post Nevin's position because there were already a number of unfilled

custodian's positions. *Id*.[9]

At approximately this same time, Plaintiff also asked Catapano if she could have a

detail to Maintenance Supervisor Tour III, since there was an opening for that position.

Catapano responded that he would place Plaintiff on a Maintenance Supervisor Detail

Tour I, but not Tour III.  In that regard, Catapano indicated that he wanted to send Plaintiff

to Tour I, and move David Turner ("Turner") from Maintenance Supervisor Tour I, where

he had been for some time, to Maintenance Supervisor Tour III.  On this point, Defendant

maintains that the Maintenance Department had a policy that required detail supervisors

to rotate shifts, and that Turner had already served as Maintenance Supervisor Tour I,

while Plaintiff had never served on Tour I.  Plaintiff admits that she had never served on

Tour I, but denies that there was any formal or written policy concerning rotation.  One of

Plaintiff's supervisors who was involved in the decision, Nicholas Mitrakos ("Mitrakos")[10],

agrees that there was no formal policy concerning rotation,[11] but indicates that Turner was

---

[9]In any event, Catapano's action in detailing Rebecca Nevins, which Plaintiff contends was in violation of the CBA, would not tend to show that he was biased against Plaintiff because of her sex.

[10]Mitrakos was Manager of Maintenance Operation Support, and was below Catapano in the Maintenance Department Chain of Command. See, Def. Stmt. of Facts ¶ 19.

[11]*See, Pl. Dep.* at 46 ("[Detail assignments are] strictly up to the Manager of Maintenance.")

8

permitted to move from Tour I to Tour III, even though he had less overall seniority than Plaintiff, because he was already serving in the Maintenance Supervisor detail on Tour I, and had more seniority in that program. *See*, Mitrakos Aff., Def. Exhibit 5 at ¶ ¶ 15, 19 ("[Turner] was interested into [sic] going to Tour III.  Being he was already participating, he would be senior to her in the program.").[12]

In any event, Plaintiff rejected the offer to go to Tour I, since she had more experience and seniority than Turner. *See*, Pl. Dep. at 46 ("If that would have been the only one, I would have taken it, but to let Dave Turner work my hours while I worked Tour I, no, I will not do that; I had more seniority.").  In that regard, Plaintiff indicates that she would have taken  detail assignment to Tour I if it was the only one available, but she did not believe that it was proper for an employee with less seniority to have a better tour assignment than her. Pl. Dep. at 45-46.  As a result, Plaintiff remained in her usual ET craft position, at her usual rate of pay.

Plaintiff maintains that Catapano's actions, in "denying" her the Mail Processing detail and the Tour III Maintenance Detail, were discriminatory on the basis of her sex.  At deposition, Plaintiff indicated that Catapano's actions were discriminatory because he similarly mistreated another female employee, Ruth Oneske ("Oneske"). Pl. Dep. at 48. In that regard, Plaintiff states that Oneske worked as a Supervisor of Maintenance for Don Wania ("Wania"), who was Catapano's predecessor as Maintenance Manager. Pl. Dep. at 49-51.  Plaintiff asserts that Oneske was actually doing the work of the male

---

[12]Plaintiff maintains that Mitrakos discriminated against her in connection with this decision, but not as to other complained of actions, which she attributes solely to Catapano. See, Pl. Dep. at 85, 76-77; Pl. Aff. at ¶ 84 ("Catapano made the hiring decisions."); ¶ 93.

supervisor above her. Pl. Dep. at 49 ("She was doing 19 level work and only getting 17

level pay. . . . Her job is Supervisor of Maintenance, but she was doing the MMO's job.").

Plaintiff states that this situation existed during "the 1990s," prior to Catapano becoming

Maintenance Manager. *Id.* Once Catapano became Maintenance Manager, Oneske

asked him if she could detail to an open MMO position, since she was already doing the

work of an MMO. Catapano permitted Oneske to detail as an MMO for awhile, but then

stopped, for reasons that are unspecified in the record:

> When Vinny [Catapano] came in, she [Oneske] asked – because now there
> was another MMO position open, and since she was already doing the work
> –  for awhile he let her be detail and was paying her the level 19 pay, and then all of a
> sudden he says, 'I can't do it anymore,' and he stopped having her do the pay, so that's
> when she initiated her EEO complaint.

Pl. Dep. at 51. Plaintiff further states that Catapano referred to Oneske as a "glorified

secretary," although the basis for her knowledge of such a statement is unclear. Pl. Dep.

at 51-52. Plaintiff adds that Catapano talked about "you know, dating women, going out

drinking with women." *Id.* at 52.[13]

In or about March 2007, Plaintiff applied for and was accepted into a USPS

Associate Supervisor program for training in the area of customer service. See, Pl. Aff. at

¶ 7; Pl. Dep. at 32. Upon completion of that program, Plaintiff became Associate

Supervisor of City Collections, and she reported to the Rochester Postmaster, Karl

Andersen. Pl. Dep. at 35-36. Plaintiff's immediate supervisor was James Fink ("Fink"). Pl.

---

[13]As for other evidence of Catapano's alleged discriminatory animus, Plaintiff cryptically refers to an incident that occurred much earlier, in or about 2004, when she sought a transfer from Maintenance to the Logistics & Distribution Center ("L&DC"). Pl. Dep. at 54-55. Plaintiff indicates that Catapano denied her transfer to L&DC, because of an "attendance" issue, but permitted two men to transfer to L&DC who had worse attendance. Pl. Dep. at 55 ("I had 68 hours of FMLA usage. . . .  Two men who were allowed over there, Dave Cannotti and a Douglas Tiner, had well over 400 hours of FMLA usage.").

Dep. at 56.

On June 7, 2007, Plaintiff filed an EEO complaint with the USPS. Pl. Ex. Vol. II, Ex. J.  The complaint concerned Catapano's decisions in January 2007, to deny Plaintiff's request to detail to Mail Processing, and her request to detail to Maintenance Supervisor, Tour III.  Notably, Plaintiff indicated that it was Mitrakos, not Catapano, who told her that if she went to Maintenance Supervisor it would be on Tour I, not Tour III. Id. at 2.  Plaintiff described her conversation with Mitrakos as follows:

> Mr. Mitrakos told me that he was going to move Dave Turner to Tour 3 and put me on Tour 1.  When I asked about the move,  Nick stated that Dave was senior to me and that he would not leave him on Tour 1.  When I told him about Dave's seniority date (Nov 26, 2005) and questioned the move, Nick told me that he was not going to leave him there.  'I'm not going to do that to the poor guy.'"

Id. at 2.  Plaintiff also complained about Catapano's alleged decision to deny her request to return to Mail Processing.  In that regard, Plaintiff indicated that Catapano told her that if she took the detail, he would post her bid because it was required by the CBA, and because another employee, Terry Hine ("Hine"), wanted her position. Id. at 4.  In her EEOC Complaint, Plaintiff also alleged that Catapano had mistreated her in May 2006 by promoting Dyson to Maintenance Supervisor Tour III because Dyson was less qualified than her. *Id*. at 6-7.

At some unspecified time between July 2007 and January 2008, while Plaintiff was working as Associate Supervisor of City Collections, Catapano deactivated Plaintiff's security badge for the Rochester Processing and Distribution Center.  Plaintiff states that she asked Catapano about it, and he responded that she didn't "belong in the building." However, Plaintiff maintains that she told Catapano that she still needed to enter the

building to do her job, and the badge was eventually re-activated.

In January 2008, while Plaintiff was working in her new position as Supervisor of City Collections, Fink issued her a letter of warning, which was placed in her employment file for four months. Pl. Dep. at 56-57.  The letter was for "failure to discharge duties conscientiously and effectively," and pertained to incidents in which Plaintiff's work was found to be deficient first in November 2007, and then again in December 2007. Pl. Ex. Vol. II, Ex. C.  Plaintiff contested the disciplinary action through her union, and a compromise was apparently reached in which the letter was removed from her file after four months, instead of the usual two-year period. Pl. Aff. at ¶ 81; Pl. Dep. at 57 ("[M]y [shop] steward got it reduced to four months.").

In February 2008, the USPS posted an opening for Supervisor of Maintenance Operations, Tour 3.  Plaintiff, Turner, and six others applied for the position.  Of the seven applicants, two were female, three were male, and one was "transgender." Def. Ex. 9 at p. 2.  The selection committee for the position consisted of three people: Catapano, David ("Miraglia"), and Mary Tarzia ("Tarzia").  Miraglia was the Manager of Maintenance Operations ("MMO") in the Rochester Processing and Distribution Center, and Tarzia was USPS Human Resources District Complement Coordinator.

After the selection committee interviewed the applicants, Catapano drafted a document, comparing the candidates, and recommending that Turner be selected. Catapano found that three of the applicants did not have minimal qualifications for the position, and one applicant withdrew his application. Def. Ex. 10 at p. 1.  The remaining four applicants included Plaintiff, Turner, and two other males.  *Id*. at 1-2.  In describing Plaintiff, Catapano wrote:

Deborah Bringley interviewed well and demonstrated good technical knowledge of maintenance operations.  She also has knowledge in mail processing operations for T-3.  Deborah was previously detailed as an acting SMO but unfortunately did not work well with her Mail Processing counterparts.  While detailed to acting SMO she had similar issues with her co-workers.  Although Deborah has good technical knowledge in many areas and her work performance is satisfactory, her inability to effectively communicate with the rest of the Staff inhibits productivity in an environment where Maintenance and Mail Processing need to work as one.  Records check also revealed that Deborah has live discipline in her file submitted this past January.  If Deborah can get some of these issues resolved along with cleaning up her discipline, she may be a good candidate for future positions.

*Id*. at 1.  As for Turner, Catapano wrote:

David Turner has been detailed to the T-3 SMO position for the past two years and has been instrumental in the success of several performance improvement initiatives including the AFCS/010 Improvement Project and OSS Special Bin Analysis.  These operations have shown significant improvement over the past year as a direct result of the aggressive operational maintenance and analysis performed by Dave's crew.  In an environment where new, complex procedures are introduced on a regular basis, Dave and his crew have been adapting and showing continuous improvement throughout.  Dave also works extremely well with his Mail Processing counterparts, providing accommodation and support whenever needed.

Although Dave has a relatively limited technical background, his communication skills enable him to successfully manage a maintenance crew consisting of several occupational groups while continuing to improve service indicators.  In 2007, with a severe staffing shortage, Dave handled the entire T-3 Maintenance Operation on his own for several months while training new 204Bs.  He is highly respected by both craft and management and is helping to form a stronger Maintenance/Mail Processing bond that is necessary for our success in today's Automated Mail Processing Environment.

Def. Ex.10 at 2.

Based on Catapano's analysis of the candidates, the selection committee chose

Turner for the position.  Turner's selection was reviewed and affirmed by two female supervisors, Plant Manager Rhonda Spate-Benton ("Spate-Benton") and District Manager Kimberly Peters ("Peters").  Plaintiff contends that Catapano was the only person who discriminated or retaliated against her, and that the other supervisors merely "rubber stamped" Catapano's selection. *See, e.g.*, Def. Ex. 7, Q.14, Q.25.

During this same period, the same selection committee, comprised of Catapano, Miraglia, and Tarzia, selected a female, Molly Knights ("Knights") as Supervisor of Maintenance Operations for Tour I.  Plaintiff did not apply for that position, since she was not interested in working Tour I.

In March 2008, prior to learning that she had not been selected for the supervisor's position that was awarded to Turner, Plaintiff wrote to Postmaster Karl Andersen, and requested that she be permitted to return to her ET position in the Maintenance Department, "due to financial reasons." Pl. Ex. Vol. II, Ex. I.  In that regard, Plaintiff indicates that she wanted to return to her old position, because, due to administrative changes affecting pay, she could have received a higher salary as an ET than as Associate Supervisor of City Collections. Pl. Dep. at 105.  Plaintiff maintains that she was "not allowed" to return to her ET position because Catapano falsely stated that there were no openings for ETs at that time.  However, at her deposition, Plaintiff indicated that she believed there had been one open position at the time, which was filled by Laurie Judge ("Judge"), a female. Pl. Dep. at 61.  Plaintiff further indicated that Judge had more seniority in the Maintenance Department at the time of her selection. *Id*. at 62.  Moreover, when questioned at deposition by Defendant's counsel, Plaintiff indicated that she did not have a problem with Judge receiving the ET position, and that the decision not to allow

14

her to return to the Maintenance Department as an ET was not part of her claim in this action. *Id*. at 62-63.  Furthermore, at oral argument before this Court, Plaintiff's counsel conceded that there is no evidence that there had been an ET opening which Plaintiff could have filled.

On or about April 26, 2008, Plaintiff filed an EEO complaint, in which she alleged that Turner's promotion was discriminatory and retaliatory, because he was less qualified than she was. Pl. Ex. Vol. II, Ex. G; see also, Ex. F, "Information for Pre-Complaint Counseling" ( "Mr. Turner received an EAS-17 promotion.  Mr. Turner has no prior mechanical experience and less than two years in the Postal Service.").  Although Turner had been employed by the USPS only since December 2005, he had previously worked for over twenty-three years in the automotive field, holding the positions Sales Manager, Fleet Manager, and Assistant Finance Manager. Pl. Ex. Vol. II, Ex. K.  Turner also had 35 years of experience as a volunteer firefighter, including EMT and OSHA training, and was a 37-year member, and past Post Commander, of the American Legion. *Id*.[14]  Additionally, Turner had been working as a detail Maintenance Supervisor since April 10, 2006. See, Pl. Ex. Vol. II, Ex. J at p. 5.

In response to Plaintiff's EEO complaint, Catapano submitted an affidavit in which he explained his reasons for not selecting her. Def. Ex. 9.  In pertinent part, Catapano stated:

> In this position, Deborah had been out of the Maintenance Department for almost a year and was doing non-maintenance details while out of the dept

---

[14]Accordingly, Plaintiff's counsel's reference to Turner as a "newbie" overlooks Turner's significant life and work experience, which obviously involved a certain degree of "people skills," which Plaintiff allegedly lacked. Pl. Memo of Law at 13-14.

and other applicants had more recent/current experience in Maintenance
Operations than she had.  In addition, she had live discipline in her file from
the Customer Service Department and we normally would not promote
someone in a supervisory or managerial position who had live discipline in
their file.

Def. Ex. 9 at p. 2.   Miraglia also filed an affidavit in response to the EEO complaint, in

which he stated that Turner was selected because he "supervised maintenance

operations on tour 1 and 3 for over 2 years and his performance met expectations," while

Plaintiff "was not selected for the position due to the answers she provided during her

interview and her qualifications for the position." Def. Ex. 11 at p. 2.

On May 20, 2008, the USPS posted an opening for the position of Supervisor of

Maintenance Operations at the Rochester Processing and Distribution Center.  Plaintiff

applied for the position, along with four others, including Manny Silva ("Silva").  Of the five

applicants, two were female and three were male. Def. Ex. 9 at p. 4.  The selection

committee again consisted of Catapano, Miraglia, and Tarzia.  Following the interviews,

Catapano again prepared a comparative analysis document, which recommended that

Silva be selected.  Regarding Plaintiff, Catapano wrote:

Deborah Bringley demonstrated good technical knowledge of some
maintenance operations.  She also has some knowledge in mail processing
operations for T-3.  Deborah's absence from Maintenance Operations for
over one year was evident in her inability to identify with some of the basic
current operational maintenance guidelines and procedures.[15]  She seemed
to be guessing at most of her answers.  Unfortunately, toward the end of the
interview, Deborah became confrontational and borderline disrespectful to
all three Interviewers.  This unfortunately [is] consistent with behavior toward
her co-workers in the past.  Although Deborah has some technical skills, her
people skills need to develop before I would recommend her for a position of

---

[15]Catapano was referring to the fact that Plaintiff had been out of the Maintenance Department for
nearly a year while she was working in the Customer Service Department.

leadership in the Maintenance Department.

Def. Ex. 19 at p. 1.  As for Silva, Catapano stated:

> Manual Silva (Manny) demonstrated strong technical knowledge of
> Maintenance Operations at all levels.  Manny has been with the USPS for
> just a few years and has become a key member of our Maintenance Team.
> He brought a wealth of technical knowledge as well as managerial
> experience from his former position at KODAK and helped up [sic]
> implement some breakthrough procedures in our department.  Manny
> interviewed extremely well and showed a genuine concern for his customers
> in Mail Processing, the Rochester P&DC and the USPS as a whole.  He
> shared some excellent ideas for budget improvement and streamlining his
> operation as well as other operations within the department.  Manny has
> been detailed to all three Maintenance Tours[16] and is knowledgeable in all
> areas.  He works very well with his co-workers and Mail Processing
> counterparts.  He is highly respected by both craft and management and is
> helping to form a stronger Maintenance/Mail Processing bond that is
> necessary for our success in today's Automated Mail Processing
> Environment.

Def. Ex. 19 at pp. 1-2.  Miraglia and Tarzia agreed with Catapano's recommendation, and

the selection of Silva was reviewed and affirmed by two female supervisors, Spate-

Benton and Peters.  Plaintiff again contends that Catapano was the only person who

discriminated or retaliated against her, and that the other supervisors merely "rubber

stamped" his selection. *See, e.g.*, Def. Ex. 7, Q.14, Q.25.

In or about August 2008, Plaintiff filed an EEO complaint, in which she alleged that

Silva's promotion was discriminatory and retaliatory. Pl. Ex. Vol. II, Ex. H.  Catapano

submitted an affidavit in response to Plaintiff's EEO complaint, in which he explained his

reasons for not selecting Plaintiff. Def. Ex. 9.  In pertinent part, Catapano reiterated the

---

[16]Silva had worked as a detail supervisor on all three tours, whereas Plaintiff had refused to go to
Tour I.

statements that he included in his Comparative Analysis. Def. Ex. 9 at pp. 3-4.  When

asked to provide any additional information concerning Plaintiff, Catapano stated:

> Complainant was an Electronic Technician in the Department over the years
> and has had many problems with her co-workers.  When I came here in
> 2005, she did not like me because I denied her transfer to the L&DC.  We
> got over that, and I encouraged her to step up and try the Acting Supervisor
> and she did very well at first and jumped in with both feet and after a while
> she started to have problems with her co-workers and would constantly butt
> heads with people which caused problems.  She then decided she wanted
> to go over to the Mail Processing side in a detail with them and unfortunately
> got into the same thing.  She has poor people skills which is unfortunate
> because she has excellent technical skills and is very smart.  She seems to
> do very well and excels until situations do not go her way and then she
> becomes very confrontational and disrespectful.  In our interview for the
> vacancy in June [2008], I experienced something I have never had happen
> and she ended the interview with, "Well, Vinnie do you have any questions
> for me?" and I told her  I did not and she proceeded to ask the other
> interviewers if they had any questions for her or questions about her
> discipline.  In summary, she needs to work on her people skills to help her
> move up in management.

Def. Ex. 9 at p. 6.

Miraglia also filed an affidavit in response to the EEO complaint, in which he stated

that Silva was selected because he "provided exceptional answers to the questions asked

by the review board members during his interview," and "[d]uring his detail to the position

of SMO, his performance exceeded expectations,"  while Plaintiff "was not selected for the

position due to the answers she provided during her interview and her qualifications for

the position." Def. Ex. 11 at p. 2-3.

Tarzia, the female member of the selection committee, indicates that the selections

were essentially made by Catapano. See, Def. Ex. 12.  However, she provided this

summary description, in which she agrees that Plaintiff became confrontational during the

second interview:

> Mr. Miraglia and I sat with Mr. Catapano and asked various questions to
> each applicant.  I did not keep any of my notes but I do recall being told that
> Ms. Bringley had disciplinary action taken against her as a Supervisor in
> Customer Services after the first time she was interviewed.  The second
> time that we interviewed her after the questions were asked she became
> confrontational with Mr. Catapano as well as with Mr. Miraglia and myself.

Def. Ex. 12 at p. 4.  Plaintiff denies that she was confrontational or disrespectful during

the interview.  In that regard, at deposition she testified, in pertinent part:

> Q. You don't think there was any – well, how was the interview?  Was it
> confrontational?
>
> A. No, it was just like any other interview.  It went along, they asked me
> questions, I answered them when I could, I told them I didn't know when I
> didn't know, and at the end they asked me – Mary had asked me if there
> was anything that I would like to elaborate on or anything I would like to
> discuss with them, and I says, 'Well, no, not myself, but is there anything
> you would want me to clarify?'  And she says, 'Well, what do you mean?"  I
> says, 'Is there anything you want me to discuss?'  And she says, 'No.'  And I
> asked as a group, and everybody nodded their heads no, so I asked
> individually.  I said, 'Mary?'  'No.'  'Dave?'  'No.'  'Vinny?'  'No.'  And I says,
> 'Are you sure, Vinny?  Are you sure you don't want to ask me about a Letter
> of Warning in my file, my OPF?'  And at first he says no, and then he
> chuckled, he says, 'Yeah, you've got one?'  And I says, 'No.'  He says, 'Are
> you sure?'  I says, 'Absolutely.'  He says, 'Are you sure you don't have a
> Letter of Warning in your folder?'  I says, 'No, it's squeaky clean.'  And he
> went, 'Oh.'  So then I asked again, because I knew Vinny knew I went down
> to Tennessee [to interview for another position with the USPS], so I wanted
> to ask about this.[17]  And I says, 'Is there anything else that you might want to
> ask me about, my future plans or anything?'  He says, 'No.'  I asked Dave.
> 'No.'  I asked Mary.  She says, 'No.'  I says, 'Okay.  That's it for me.  Thank
> you for the interview,' and I got up and walked out.  Now, I'm sorry if they felt
> that that was confrontational, but that was my part of the interview to ask.

---

[17]Plaintiff had already applied for another job with the USPS in Tennessee, and she apparently
was concerned that this fact would cast doubt on whether she was committed to pursing the job in
Rochester for which she was interviewing.

And since that was one of the things that they said previously, why I didn't get the previous job, I wanted to clarify it.  And I thought that was my time in the interview to get it straightened out, and I thought I was polite about it; I don't know how much more professional I could have been besides that.

Pl. Dep. at 94-97.

Plaintiff also alleged in her EEO complaints that Catapano had retaliated against her by not selecting her for the two positions in 2008.  Catapano indicates that he was aware that Plaintiff had filed several EEO complaints, including some against him, but that such complaints did not affect his decisions not to promote her. Def. Ex. 9 at 5 ("She has several [complaints] and I an not sure where they are at  or what the status is on each one.  I became aware [of the complaints] because I have been named in some of her EEO complaints.  I do not know how many there are.  I know she has other EEO complaints with the Customer Service Department based on information from other managers but I have no direct knowledge of the basis of these complaints or their status.").

On December 12, 2007, Plaintiff commenced this action.  The Complaint [#1] purported to assert claims under Title VII, the New York State Executive Law, and the Equal Pay Act.[18]  On March 20, 2008, Plaintiff filed an Amended Complaint [#2], which is now the operative pleading.  The Amended Complaint asserts claims of discrimination

---

[18]*See*, Complaint [#1], "Wherefore" clause.  Although, the Complaint is inconsistent as to the claims being asserted.  For example, the "Preliminary Introduction" section of the pleading indicates that the action is brought solely under Title VII, and the body of the Complaint refers to Title VII.  However, the "Jurisdiction and Venue" section of the Complaint refers to unspecified "claims under state law," while the "wherefore" clause refers to Title VII, the New York State Executive Law, and the Equal Pay Act.

and retaliation solely under Title VII.[19]  On February 20, 2009, Plaintiff commenced a

second action against Defendant in this Court, *Bringley v. Potter*, 09-CV-6077 DGL,

which asserts further claims of discrimination and retaliation under Title VII.  On July 8,

2009, the two matters were consolidated in the instant case.

On October 27, 2010, Defendant filed the subject summary judgment motion [#15].

As to the alleged discrimination in January 2007, Defendant maintains that Plaintiff cannot

establish a prima facie case because she did not suffer an adverse employment action.

On this point, Defendant contends that Plaintiff was not denied a detail assignment, but

rather, that she declined to accept either of the two details that were offered to her, one

because she did not like the hours, and the other because she did not want her bid to be

posted as required by the CBA.  As for the two instances of alleged discrimination in

2008, Defendant also contends that Plaintiff has failed to establish a prima facie case,

because she cannot show that she was denied promotion under circumstances giving rise

to an inference of discrimination.  Alternatively, Defendant contends that, even if Plaintiff

can establish a prima facie case, it had  legitimate non-discriminatory reasons for not

promoting her.  As to the retaliation claim, Defendant argues that Plaintiff has not shown a

prima facie case, since she has not established a causal connection between her

protected activity and the failures to promote her.  Moreover, Defendant contends that

even if Plaintiff could make out a prima facie case, it had legitimate non-retaliatory

reasons for not promoting her.

---

[19]Consequently, while Plaintiff's Memo of Law refers to "state law claims" "under the New York Human Rights Law," no such claims are pending before this Court. *See*, Pl. Memo of Law [#19-3] at 2, n. 3.

On November 3, 2011, counsel for the parties appeared before the undersigned for oral argument.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof

22

in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted).  Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829 (1985).

*Title VII*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations

omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).

With these general legal principles in mind, the Court will proceed to consider Plaintiff's claims.

*Disparate Treatment*

Disparate treatment discrimination claims are analyzed using the well-settled *McDonnell Douglas*[20] burden-shifting framework:

> A plaintiff establishes a prima facie case of discrimination by showing that he or she (1) is a member of a protected [group] . . . .; (2) was qualified to perform the duties required by the position; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred in circumstances that gave rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).
>
> ***
>
> Once the plaintiff presents a prima facie case[21], the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon the defendant's articulation of a legitimate, non-discriminatory reason, the presumption of discrimination arising from the plaintiff's prima facie showing " 'drops out of the picture,' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000), and the burden of production shifts back to the plaintiff to adduce evidence sufficient for a reasonable jury to conclude that discrimination was a reason for the employment action, *see Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000). In deciding a motion for summary judgment, the court is to examine "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Id.* at 90 (*quoting*

---

[20] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[21] "A plaintiff's burden of establishing a *prima facie* case is *de minimis*. The requirement is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 467 (citations and internal quotation marks omitted).

> *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Thus, summary judgment is appropriate when the plaintiff "has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor" in the defendant's employment decision. *Schnabel*, 232 F.3d at 91.

*Butts v. NYC Dept. of Housing Preservation and Dev.*, No. 07-1930-cv, 307 Fed.Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. Jan. 28, 2009); *see also, Terry v. Ashcroft*, 336 F.3d at 138 ("[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.") (citations and internal quotations omitted).

Assuming that a plaintiff establishes a prima facie case, and that the defendant provides a non-discriminatory reason for the employment action, at the third tier of the *McDonnell Douglas* test, the plaintiff is required "to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 470.  If the plaintiff succeeds, such evidence may, or may not, establish the additional required proof of discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.  In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v. Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)).  "The relevant factors

. . . include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." *Id*. (internal quotation marks omitted).

### Alleged Denial of Detail Assignments in January 2007

Concerning the alleged discrimination in January 2007, Defendant contends that Plaintiff cannot establish a prima facie case, because she did not suffer an adverse employment action, and alternatively, that it had legitimate non-discriminatory reasons for its actions.  Plaintiff responds that she suffered adverse employment actions, and that Defendant's reasons are pre-textual.  The Court finds that, even assuming *arguendo* that Plaintiff has made the minimal showing necessary to establish a prima facie case, Defendant has proffered legitimate non-discriminatory reasons for its actions, and Plaintiff has not shown that those reasons are false, or that Defendant's actions were based on discriminatory animus.  Beginning with the detail assignment to Maintenance which Plaintiff did not accept, it is undisputed that Mitrakos told Plaintiff that she could have the detail assignment, provided that she went to Tour I.  It is also undisputed that Plaintiff rejected that offer, because she believed that she should have the slot on Tour III, rather than allowing Turner to move to Tour III from Tour I.  Plaintiff maintains that Mitrakos's offer was discriminatory, because Turner was a male with less overall experience at the USPS.  She further indicates that an assignment to Tour I was discriminatory, because the night-shift was an unpopular assignment for most people, and was the equivalent of

punishment.[22]  However, she admits that there was no labor rule to support her view, and

that supervisors had discretion to make those types of assignments.  Furthermore, Turner

had already been working on Tour I, and Mitrakos indicated in sum and substance that it

was more fair to allow Turner to rotate to Tour III, rather than leaving him on Tour I, since

Plaintiff had admittedly never worked Tour I.   This explanation is reasonable and was

within Mitrakos's discretion.  Plaintiff has not shown that the reason is false, or that

Mitrakos and/or Catapano was actually motivated by discriminatory animus aimed at

favoring Turner because he was male.

     As for the alleged denial of the Mail Processing detail, Defendant has likewise

come forward with a legitimate non-discriminatory reason for its actions, which Plaintiff

has not shown to be false.  In that regard, it is undisputed that Catapano told Plaintiff that

she could return to the Mail Processing Detail, where she had just spent four months, but

that he would have to post her ET bid, pursuant to Article 38.7.E of the CBA.  That is,

Catapano indicated that he would have to post her bid, since a return to mail processing

would result in her spending more than four months in the same detail, and the CBA

---

[22]Plaintiff's contention on this point is belied by the fact that Turner and Silva, whom Plaintiff says were Catapano's "male pets," both worked Tour I before receiving their promotions.  Plaintiff does not explain why Catapano would have "punished" Turner and Silva in that manner if it was his intention to favor them.  Instead, Plaintiff suggests that Turner may not have actually worked Tour I, since that fact does not appear on his resume.  However, Turner's resume merely states the positions that he worked, not the shifts, and there is unrebutted evidentiary proof in admissible form that Turner worked Shift I. *See, e.g.*, Def. Ex. 5, Mitrakos Aff. ¶ 10.  In addition, in response to Plaintiff's EEO complaint, Mitrakos submitted a sworn affidavit indicating that the opening on Tour III was created because Silva, who was then working on Tour III, was going to be sent to Tour I, while Turner moved from Tour I to Tour III to fill the opening. Def. Ex. 5 at p. 6.  Mitrakos further indicated that the extra opening on Tour I, to which Catapano wanted to assign Plaintiff, was created by the impending departure of Gene Cherkis, a craft employee, from the Tour I detail. *Id.*  This uncontradicted explanation again belies Plaintiff's contention that an assignment to Tour I was punitive, since Silva, whom she claims was Catapano's "pet," was being considered for assignment to Tour I at the same time that Mitrakos and Catapano wanted to send Plaintiff there.

forbid craft employees from returning to their craft positions for a short time merely to circumvent that rule.  Catapano further indicated that Plaintiff's union had communicated to him that if Plaintiff went back to Mail Processing, it would expect him to post Plaintiff's bid, since it was a desirable one which other craft members would want.  In fact, Catapano indicated that another ET, Terry Hine ("Hine"), had already expressed an interest in obtaining Plaintiff's bid. *See*, Def. Ex. 1 at p. 4.  In this regard, Plaintiff admits that her bid was a good one, since it involved favorable hours and having weekends off. *See*, Def. Ex. 1 at p. 4 ("[H]e was going to post my ET job for bid, because another ET wanted it.  Therefore I would lose my work hours and weekend days off.").  Accordingly, Defendant has met its burden of coming forward with a legitimate non-discriminatory reason for why it offered Plaintiff the Mail Processing detail, on the condition that her bid would be posted.

Plaintiff, however, maintains that this proffered explanation is false, for several reasons.  First, she contends that the CBA did not actually require that her bid be posted, as long as she returned to her craft position for two weeks before returning to the Mail Processing detail, where she had just spent four months.  Although this argument may be supported by the 2007 version of the CBA which became effective in February 2007, it is not supported by the 2003 version of the CBA which was still in effect in January 2007.  In fact, the 2003 version of the CBA expressly forbids craft employees from evading Art. 38.7.E by returning to their craft positions for short periods before returning to detail assignments.  Catapano's interpretation of Art. 38.7.E was reasonable, while Plaintiff indicates only that the 2003 version of the CBA was "vague" on this point. See, Def. Ex. 1 at p. 5 ("The old contract was vague on the topic.  The new contract, which took affect

28

*Feb 3, 2007*, clarified the matter.") (emphasis added).   Alternatively, Plaintiff argues that

Catapano's explanation was false, because he selectively enforced Art. 38.7.E against

her.   More specifically, she indicates that Turner was on a detail for more than six months,

and Catapano did not post his bid.   However, Catapano explains that Plaintiff and Turner

were not similarly situated, for the following reason: Turner was a custodian, and the

union was not pressuring him to post Turner's bid, since it was not a sought-after bid and

there were already a number of unfilled custodian positions.   Plaintiff has not proffered

evidentiary proof in admissible form that this explanation is false.   Finally, Plaintiff

contends that Catapano's explanation was false because the union was not actually

pressuring him to post her bid, as he claims.   Once again, though, Plaintiff has not

proffered any evidentiary proof in admissible form to support this contention.   Instead, she

merely relates a hearsay conversation that she allegedly had with a union steward,

Sheehan, who indicated that he had not personally spoken to Catapano about Plaintiff's

position.   Such inadmissible hearsay is insufficient to create a triable issue of fact as to

whether Catapano's explanation is false.   Moreover, Plaintiff offers no explanation for why

Catapano would decide to discriminate against her on the basis of her sex in January

2007, when he approved her for the very same detail only four months earlier, and had

approved other details prior to that.[23]   *See, Carlton v. Mystic Transp., Inc.*, 202 F.3d 129,

137 (2d Cir. 2000) ("When the same actor hires a person already within the protected

class, and then later fires that same person, it is difficult to impute to her an invidious

---

[23]At deposition, Plaintiff suggested that Catapano did not mind approving her for temporary
details, but discriminated against her when it came to promotions for permanent positions. See, Pl. Dep.
at 37 ("It was all right for me to be detailed, but when it came time for the promotion of Mr. Dyson [to a
permanent supervisor's position], I didn't get the promotion.").   This statement is therefore inconsistent
with Plaintiff's theory that Catapano discriminated against her with respect to detail assignments.

motivation that would be inconsistent with the decision to hire.") (citation and internal quotation marks omitted).  For example, Plaintiff does not contend that Catapano dissuaded her from taking the Mail Processing detail because he wanted to give the detail to a male.[24]

Despite failing to show that Defendant's proffered reasons are false, Plaintiff nevertheless maintains that she has shown discriminatory animus in general, by referring back to the alleged discriminatory promotion of Dyson in 2006.  In that regard, Plaintiff states that Dyson was less qualified and less experienced than she, and that Dyson had "problems with the paperwork" and  "attendance problems." See, Def. Ex. 1 at p. 6; Pl. Dep. at 37-44; Pl. Aff. at ¶ ¶ 20-22.  Defendant has not submitted any evidence disputing Plaintiff's characterization of the Dyson promotion,[25] and Defendant's initial Memo of Law does not even mention Dyson.  However, Defendant's Reply Memo of Law briefly addresses the Dyson issue, in pertinent part as follows:

> Plaintiff did not initiate EEO proceedings as a result of Mr. Dyson's 2006 selection.  Moreover, Plaintiff has not proffered any evidence that the selection of Mr. Dyson was the result of illegal sex discrimination.  The facts concerning this non-selection do not raise a triable issue of fact that Plaintiff's 2007 detail assignments or 2008 non-selection were the result of illegal discrimination based on sex.

Def. Reply Memo at 3-4 (citations omitted).  As to these contentions, the Court notes, first, that Plaintiff is not barred from using evidence of the 2006 Dyson promotion to

---

[24] Nor does Plaintiff specifically maintain that Catapano threatened to post her craft bid because he wanted it to go to a male.

[25] Defendant chose not to submit any new affidavits or deposition testimony from its witnesses, but instead chose to rely on affidavits and other documentary evidence that was part of the EEO administrative file.

establish discriminatory intent merely because she did not file an EEO complaint complaining about that incident.  In addition, Plaintiff has in fact proffered *some* evidence that Dyson's promotion was discriminatory, since she has stated, although in conclusory fashion, that she was denied a promotion that was given to a male with far less qualifications than she had.  The question, therefore, is whether Plaintiff's evidence on this point is sufficient to defeat summary judgment.

The Court does not believe that such evidence is sufficient.  To carry her burden at the third step of the *McDonnell Douglas* analysis, Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reasons for the challenged actions." *Escribano v. Greater Hartford Academy of Arts*, No. 09–4553–cv, 2011 WL 4001030 at *2 (2d Cir. Sep. 9, 2011) (citation omitted).  Here, Plaintiff's conclusory statements that she was more qualified than Dyson are not sufficient to support a rational finding that the actions complained of in this lawsuit were discriminatory.[26]  *See, e.g., Ferguson v. Barram*, No. 98 Civ. 5368(THK), 2000 WL 375243 at *6 -7  (S.D.N.Y. Apr. 11, 2000) ("Plaintiff also asserts that he was more qualified than Iemma. Plaintiff contends that Iemma "[h]ad very little experience. I know that for a fact," and "I have more experience [than Iemma], more knowledge and skills, in the area that we worked in."  However, plaintiff has come forward with no evidence, beyond his conclusory opinions, with respect to Iemma's qualifications,

---

[26] Plaintiff attached certain documentation concerning Dyson to her EEO complaint, which is in the record.  However that information, consisting primarily of coded employment records that are unexplained and unintelligible to the Court, do not establish that he was less qualified than she. See, Def. Ex. 1.

31

or to show that he was more qualified than Iemma.") (citation omitted); *see also, Jugueta v. Perry*, No. 95 CIV. 10303 (DC), 1997 WL 742535 at *5 (S.D.N.Y. Dec. 1, 1997) ("Even assuming plaintiff was denied three prior promotions that went to white candidates, those facts alone do not support a finding of discrimination. Plaintiff's allegations are merely conclusory. Plaintiff does not offer any evidence to show that he was better qualified than the three individuals selected for the three previous GM–13 or GS–13 positions, nor does he offer any evidence to show that he was not selected for these positions because of his race, color, or national origin.").

As other evidence of discriminatory animus, Plaintiff alleges that Catapano disliked women generally, and suggests that he excluded them from socializing in his office. *See, e.g.*, Pl. Dep. at 55-56 ("[T]he men [would] go into his office and chitchat, he wouldn't chitchat with the women; we were troublemakers and such.").  Contradictorily, though, she also complains that Catapano spent too much time in his office with women. *See*, Pl. Counter-statement of Facts ¶ 91 ("Catapano constantly had younger craft female employees in his office, laughing and talking.").  Plaintiff also includes inadmissible, unsupported allegations that Catapano had improper relationships with female co-workers, including an allegation that he had a sexual relationship with a female co-worker which led to her obtaining a position as a postmaster. See, Pl. Counter-statement of facts ¶ ¶ 93-95; *id*. at ¶ 92 ("*It was common talk at the facility* that Catapano had invited several younger female employees at [sic] his home and on his boat.") (emphasis added).  None of these contentions raises a triable issue of fact as to discriminatory animus.

Lastly, Plaintiff contends that Catapano held discriminatory animus toward her, because he also mistreated another female employee, Oneske.  In support of that contention, Plaintiff's counsel has submitted an affidavit from Oneske that is largely inadmissible.[27]  The select portions of Oneske's affidavit that would be admissible purport to state the following facts: 1) prior to Catapano becoming Manager of Maintenance, Oneske worked for his male predecessor in that position, Wania;  2) Wania forced her to "perform the job duties" of a male employee, Mitrakos, who had a higher pay grade than her; 3) such arrangement was unfair because Oneske was doing the work of Mitrakos, who received a "level 19 salary," while she received a "level 17 salary"; 4) when Catapano became Manager of Maintenance, Oneske asked him to promote her to a level 19 salary, since she was already doing the work of a level 19 employee; 5) Catapano detailed Oneske to a level 19 position for an unspecified period, then told her that he "could not do it anymore";[28] and 6) Catapano later moved Oneske out of the office that she had "occupied for twenty years," for unspecified reasons, and gave the office to a younger female employee.  Oneske Aff. at ¶ 23.  Such allegations do not establish a triable issue of fact as to whether the employment actions complained of in this action were affected by discriminatory animus.  In that regard, Oneske's conclusory statements, including her

---

[27]A representative example of the inadmissible statements in Oneske's "affidavit" is the following: "Since being diagnosed with esoshageal [sic] cancer on August 5, 2010, undergoing months of chemo-treatment, and preparing for surgery scheduled in January 2011, I no longer have the stamina to endure Catapano's vindictiveness, hostility, and differential treatment.").  Oneske Aff. ¶ 17.  Another example of Oneske's inadmissible and unsupported contentions that Plaintiff's counsel characterizes as "statements of fact" is this: "Catapano's egregious, irresponsible, and unethical conduct remains unchecked.  If you are not male or not one of the younger female employees that Catapano is pursuing romantically or sexually, your employment at the postal service is not safe." Pl. Counter-statement of Facts, ¶ 124 (citing ¶ 60 of Oneske's affidavit).

[28]This fact is taken from Plaintiff's deposition at p. 51.  Oneske's affidavit does not mention that she was detailed to the level 19 position.

bald assertion that she "performed the duties" of Mitrakos, are insufficient to defeat summary judgment.

For all of the foregoing reasons, Plaintiff has not carried her burden at the third step of the *McDonnell Douglas* analysis with regard to the January 2007 detail assignments. Accordingly, Defendant is entitled to summary judgment on those claims.

### Alleged Denial of Promotions in 2008

Defendant similarly maintains that it is entitled to summary judgment on the 2008 failure-to-promote claims, because several females were involved in the selection process, and because Defendant had good reasons for selecting Turner and Silva instead of Plaintiff. As to this position, Defendant contends that Plaintiff cannot establish a prima facie case, since she cannot show that the failures to promote Plaintiff occurred under circumstances giving rise to an inference of discrimination, since the same people who promoted Turner and Silva also promoted Knights, a female, and since Tarzia, Spates-Benton, and Peters, all of whom are female, concurred in promoting Turner and Silva. Alternatively, Defendant maintains that it had legitimate non-discriminatory reasons for promoting Turner and Silva, since they were better suited for the positions. On this point, Defendant states that Turner did a good job supervising Tours I and III for two years, and had good communication skills, while Plaintiff had good technical skills but poor people skills and an open disciplinary issue. As for Silva, Defendant states that he had a strong interview and displayed good management skills, while Plaintiff's skills were rusty from being away from maintenance for almost a year, and she was disrespectful during the interview.

Plaintiff responds that Turner and Silva were both less qualified than she was, and that she was "professional" during her interview in July 2008.  She further states that Silva should not have received the promotion because he had a history of sexually harassing female co-workers.  As to such alleged sexual harassment by Silva, at deposition Plaintiff stated that she previously worked with Silva, and "[h]e is constantly talking to women and rubbing them while he talks to them; rubs their arms, rubs their backs.  There's been many complaints about him, and he and Laurie Judge ["(Judge")] – Laurie had the biggest problem with him." Pl. Dep. at 78.  Plaintiff states that she told Judge to file a complaint against Silva, but she does not know whether Judge did so.  *Id*. at 80.  Plaintiff states, though, based on hearsay, that Judge "talked to [Spates-Benton] and talked to some other people" about Silva's behavior.  *Id*.  As for her own experience, Plaintiff indicates that Silva wanted to hug her or rub her arm whenever he talked to her, and that she told him to stop.  *Id*. at 79.  She further indicates that she complained about Silva to a supervisor, Lonny Amthor ("Amthor"), and that Silva stopped touching her after she again told him to stop.  *Id*. at 79 ("He tried one more time with me and I had a discussion with him and then he knocked it off.").  However, Plaintiff offers no evidentiary proof in admissible form that anyone involved with Silva's promotion knew about these allegations of improper touching.[29]

On all of the facts of record, the Court finds that Defendant is entitled to summary judgment on the 2008 failure-to-promote claims.  Even assuming that Plaintiff can

---

[29]Moreover, even if the Court could consider the hearsay contention that Judge complained about Silva to Spates-Benton, Plaintiff denies that Spates-Benton had any discriminatory animus toward her. Pl. Dep. at 77.

establish a prima facie case, Defendant has proffered non-discriminatory reasons for why Turner and Silva were selected, and Plaintiff has not shown that those reasons are false or that she was discriminated against.  For example, as discussed above, Plaintiff's subjective belief that she was better qualified than Turner and Silva for the particular positions is insufficient to raise a triable issue of fact.  Nor is the mere fact that Plaintiff had worked at the USPS for thirty years and had good technical skills, sufficient. Similarly, Plaintiff's conclusory statement that her July 2008 interview was "professional" is not sufficient to defeat summary judgment.  In that regard, as discussed above, at deposition Plaintiff described her conduct during the interview, and such conduct could easily have been construed as confrontational or disrespectful, regardless of Plaintiff's subjective perception that it was not.  Notably, on this issue, Tarzia agreed that Plaintiff became "confrontational" with Catapano and herself, and Plaintiff does not claim that Tarzia had any discriminatory animus toward her. Pl. Dep. at 77.  The Court further notes that with regard to these promotions, Turner and Silva were selected over both male and female candidates, and in the case of Turner, Plaintiff indicates that all of the candidates were better qualified than him,[30]  which does not support an inference that Plaintiff was passed over because she was female. *See, Brown v. Henderson*, 257 F.3d 246, 254 (2d Cir. 2001) ("[I]n the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex.")  Accordingly, Plaintiff has not carried her burden at the third tier of the *McDonnell*

---

[30]Notably, Plaintiff subjectively maintains that *all* of the candidates, male and female, were more qualified than Turner. Pl. Dep. at 70 ("We all had more qualifications than Mr. Turner.").

*Douglas* analysis with regard to the 2008 failure-to-promote claims.

*Retaliation*

Title VII retaliation claims are also analyzed using the *McDonnell Douglas* three-tier

burden-shifting test discussed above. *Valentine v.Standard & Poors*, 50 F.Supp.2d 262,

281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d 1327

(2d Cir. 2000).

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  First, the plaintiff must establish a prima facie case of retaliation by showing: " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is " de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. (internal quotation marks omitted).
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id*. The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id*. A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

Here, Defendant maintains that it is entitled to summary judgment on Plaintiff's

retaliation claims, which allege that the two non-promotions in 2008 were retaliatory.

Defendant contends that Plaintiff cannot establish a prima facie case because she cannot demonstrate causal nexus, and alternatively, that even if she can, that it had legitimate non-retaliatory reasons for not promoting her, as discussed above.[31]  Plaintiff counters that she has shown a prima facie case, and that she has also raised a triable issue of fact as to retaliatory intent, based on the following factors: 1) Fink issued her a disciplinary letter in January 2008; 2) Catapano deactivated her security badge after she left the Maintenance Department and went to work for the Customer Service Department; 3) Catapano did not permit her to return to the Maintenance Department in the Spring of 2008; and 4) she was denied the promotions in April 2008 and July 2008.

Considering the parties' arguments and the entire record, the Court finds that Defendant is entitled to summary judgment on the retaliation claims, because Plaintiff has not carried her burden at the third step of the *McDonnell Douglas* analysis.  For example, Plaintiff has not come forward with any evidence that her disciplinary letter from Fink was in any way connected to her protected activity, and in that regard she has not even shown that Fink was aware of such activity.  As for Catapano deactivating her security badge, Plaintiff indicates that Catapano told her that he deactivated the badge because she did not belong in the building, inasmuch as she was then working as Associate Supervisor of City Collections.  Plaintiff states that she told Catapano that she still needed access to the building as part of her job, and her badge was eventually reactivated after the employee who controlled such matters returned to work.  Plaintiff does not explain how such

---

[31] Defendant also contends that Spates-Benton and Tarzia did not know about Plaintiff's protected activity.  However, that point is disputed, and in any event, it is undisputed that Catapano was aware of Plaintiff's protected activity, and Plaintiff maintains that he was the person who really made the decisions to promote Turner and Silva.

incident is causally connected to her EEO complaint.  As for her contention that Catapano

prevented her from returning to her ET position in the spring of 2008, as discussed above

Plaintiff's counsel admits that there is no evidence that there was such an opening.  As for

her contention that the two non-promotions in 2008 were retaliatory, the Court finds that

Defendant has offered legitimate non-discriminatory reasons for those decisions, and

that, as already discussed, Plaintiff has not raised a triable issue of fact as to whether

Defendant was actually motivated by retaliatory animus.  In short, Plaintiff has not

produced evidentiary proof in admissible form sufficient to allow a reasonable trier of fact

to conclude that retaliation was a determinative factor in Defendant's decisions to

promote Turner and Silva.

CONCLUSION

For the foregoing reasons, Defendant's summary judgment motion [#15] is granted

and this action is dismissed.

SO ORDERED.

Dated: Rochester, New York
       November 18, 2011

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge